2014 VT 97

# State of Vermont v. Patrick Bostwick

[103 A.3d 476]

No. 13-013

Present: Reiber, C.J., Dooley, Skoglund, Robinson and Crawford, JJ.

Opinion Filed August 1, 2014

*William H. Sorrell,* Attorney General, and *David McLean,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio,* Defender General, and *Anna Saxman,* Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** Defendant appeals from a court order finding him in violation of his conditions of probation. We hold that his conduct was not inconsistent with the plain language of his probation conditions, and reverse.

¶ 2. Defendant was convicted of lewd and lascivious conduct with a child, 13 V.S.A. § 2602, and sentenced to three to fifteen years, all suspended but six months. Defendant's probation order contained the following "special sex offender conditions": "You will not live in an apartment complex that allows children, in neighborhoods with large numbers of children, or in neighborhoods near parks, schools, playgrounds, etc, unless directed otherwise by your Supervising Officer"; and "You shall reside where your Supervising Officer directs. You shall not change your residence without the prior written permission of your Supervising Officer."

¶ 3. While defendant was still incarcerated, the State filed a probation violation complaint, claiming that defendant had violated the condition stating: "You shall reside where your Supervising Officer directs." The State claimed that defendant had violated this condition because he did not submit a residence for his probation officer's approval prior to his release and therefore he would be homeless upon his release. The court dismissed the complaint for "impossibility of performance." During the hearing, the court explained:

> I'll dismiss it without prejudice . . . the sense being that they can renew it if after a reasonable time, [defendant] shows no effort, for example, to get housing in an appropriate place, . . . or can't get it because of some fault on his part, then certainly they're free to refile it if they think they can make out a prima facie showing of a violation based on not living where he's supposed to live. . . . I don't think that this is a violation because he hasn't had an opportunity to try to find a place.[1]

---

[1] Defendant argues that the court modified the probation condition when it ruled on the first revocation complaint, and that the modified condition should have been applied by the trial court and should be applied by this Court. In the probation

¶ 4. Defendant was subsequently released and, with approval from his probation officer, resided at a few temporary addresses in succession. In early July 2012, defendant moved to the Budget Inn in Barre, another location that his probation officer had approved as only temporary because it was "near children." The probation officer told defendant he needed to look for housing "daily." The probation officer also told defendant that "he had 8/1/2012 as a deadline to show housing search efforts — a genuine housing search effort."

¶ 5. Defendant received a list of available apartments from Community Action, supplemented by listings his wife found for him. Defendant's income was limited to a Social Security disability check of $720 per month. Defendant could not use the internet to look for apartments directly because a condition of his release as a sex offender prevented him from having access to the internet. Defendant was on a twenty-four hour curfew, other than visiting prospective apartments and a weekly trip for groceries. He kept a log of calls he made to prospective landlords. As required, defendant announced to every person he called that he was on probation for lewd and lascivious conduct with a child.

¶ 6. Defendant's log indicates that he made calls or had his wife email approximately seventy times looking for housing between June 12 and August 6, 2012. He testified that his inquiries were denied for a variety of reasons, including that the buildings had no vacancies, that the landlords did not want to rent to a convicted sex offender, or the apartments were too expensive. On July 23, 2012, he found one apartment that he might have rented, but his probation officer did not approve it for him because it was too close to a school.

¶ 7. In its decision revoking defendant's probation, the trial court noted that defendant's call log "shows between June 26th and July 20th — except for a single telephone call made on July 10th — the Defendant did not make any housing search. He also made no search from July 28th through August 3, 2012. As of August 1, 2012, the Defendant had not obtained approved housing."

¶ 8. As the trial court noted, the State must show a probation violation by a preponderance of the evidence, and

revocation decision on appeal, the court noted the initial decision but applied the probation conditions as written. Because of our disposition, we do not consider whether a modification occurred.

defendant must have received fair notice of the condition he allegedly violated. *State v. Gleason*, 154 Vt. 205, 216, 576 A.2d 1246, 1252 (1990). The trial court further noted that, after the initial proof of violation, the burden shifts to the defendant to show that the "failure to comply was not willful but rather resulted from factors beyond his control and through no fault of his own." *State v. Austin*, 165 Vt. 389, 398, 685 A.2d 1076, 1082 (1996).

¶ 9. In its analysis, the court found that defendant "certainly should have known that abandoning his efforts to find housing for several days . . . was not in compliance with his obligations under the terms of his probation." The court determined that finding an approved residence was "an important component of the defendant's sex offender treatment, as well as necessary for public protection." Further, "defendant's failure to have approved housing, after being afforded a meaningful opportunity to do so following his release from incarceration, undermines the probationary goal of protecting society from the defendant." The court concluded that defendant had violated two terms of his probation. First, he violated the condition stating: "You shall reside where your Supervising Officer directs. You shall not change your residence without the prior written permission of your Supervising Officer." Next, because the Budget Inn was close to children, he also violated the condition stating that: "You will not live in an apartment complex that allows children, in neighborhoods with large numbers of children, or in neighborhoods near parks, schools, playgrounds, etc, unless directed otherwise by your Supervising Officer."

¶ 10. Defendant argues that the requirements that he make housing search calls every day and find housing by a certain date were not part of his court-ordered probation conditions. Therefore, defendant claims that his probation officer lacked authority to impose those requirements on him and that defendant had no notice of the consequences of failing to fulfill those requirements. Defendant also argues that the condition that he not live in "a neighborhood near parks, schools, playground, etc" is overbroad and delegates too much authority to his probation officer. Defendant further argues that he had no meaningful opportunity to find housing, that it was in fact impossible for him to find housing, and that his failure to find housing was not willful. Lastly, defendant argues that his probation should not have been revoked because

there was no evidence that his lack of housing interfered with the ability of the Department of Corrections (DOC) to supervise him or endangered the public, and that revoking his probation over this issue was tantamount to punishing him for being poor. Because we agree with defendant that he did not violate any of his court-ordered conditions of release, we do not reach the remainder of his arguments.

¶ 11. ▆ We review the trial court's determination that defendant violated his probation in two steps. First, we examine the trial court's factual findings and uphold them "if supported by credible evidence." *State v. Sanville*, 2011 VT 34, ¶ 7, 189 Vt. 626, 22 A.3d 450 (mem.). Second, we examine the trial court's "implicit legal conclusion that the probationer's actions violated his probationary terms." *Id.* We uphold that legal conclusion if it is "reasonably supported by the findings and does not constitute an erroneous interpretation of the law." *Id.* The trial court's factual findings here are undisputed, so we analyze only the court's legal conclusions.

¶ 12. The trial court here found violations of two probation conditions. We conclude that neither violation was justified by the language of the probation condition at issue. To the contrary, "the probation officer crossed the line between condition interpretation and modification" in imposing the new requirements regarding the rate of call frequency and the deadline by which defendant needed to find housing or be found in violation. *State v. Rivers*, 2005 VT 65, ¶ 19, 178 Vt. 180, 878 A.2d 1070.

¶ 13. In *Rivers*, the defendant had a probation condition which prohibited him from having contact with children under the age of sixteen without prior written approval from his probation officer. The trial court found the defendant to be in violation of that condition because he went to the Champlain Valley Fair and stood near children in the lines for rides. There was no evidence that the defendant touched, spoke to, or stalked any children. The defendant had previously been warned by his probation officer "that attendance at the fair would place him in contact with children, and that he could not have that contact unless he was supervised by an approved adult." *Id.* ¶ 14. The trial court accepted the probation officer's warning to the defendant as fair notice that going to the fair would violate the defendant's probation condition.

¶ 14. ▮ We found that the problem with the trial court's reasoning was that it gave "the probation officer authority to determine which public places [the] defendant may frequent without any judicially-imposed standards to restrain her authority. . . . [T]his results in an improper delegation of the court's power to impose probation conditions." *Id.* (citing *State v. Moses*, 159 Vt. 294, 300, 618 A.2d 478, 481-82 (1992)). We noted that the courts retain exclusive power to modify probation conditions under 28 V.S.A. § 253(a). *Rivers*, 2005 VT 65, ¶ 15; see also *Moses*, 159 Vt. at 301, 618 A.2d at 482 ("Such [a contrary] approach depends for fairness on the probationer coming forward to challenge decisions of a person who has a great deal of power over her life. To avoid these consequences, the Legislature placed the power to impose probation conditions on the court . . . ."). Before being subject to any modification to a probation condition, a defendant must have a reasonable opportunity to challenge that modification. 28 V.S.A. § 253(b). We concluded that the probation officer's application of the probation condition — that the defendant could not attend the fair unsupervised — was not "evident" from the plain language of the probation condition prohibiting contact with children. *Rivers*, 2005 VT 65, ¶ 16. We found that the probation officer's interpretation materially and impermissibly changed the condition from a contact-based condition to a location-based one. *Id.* ¶ 19. We therefore reversed the trial court's decision finding that the defendant violated his probation condition. *Id.*

¶ 15. As noted above, the case at issue here involves two different probation conditions. We find that our analysis in *Rivers* properly disposes of both, but we address and reverse the trial court's conclusions regarding each condition separately.

¶ 16. First we address the trial court's conclusion that defendant violated the condition reading "You shall reside where your Supervising Officer directs. You shall not change your residence without the prior written permission of your Supervising Officer"[2] because defendant did not find permanent, approved housing by

---

[2] We struck down a virtually identical condition in *Moses*, 159 Vt. 294, 618 A.2d 478, and again, recently, in *State v. Freeman*, 2013 VT 25, 193 Vt. 454, 70 A.3d 1008. In *Moses*, we concluded:

> Rather than fashioning a specific restriction relating to defendant's choice of residence, however, the court turned over to a probation officer the complete power to determine defendant's residence, with no guiding standards. Under this condition, the probation officer can

August 1 and because there were periods of time in which defendant did not call any landlords.

¶ 17. ■ As in *Rivers*, the plain language of the probation condition simply does not support this conclusion. The second sentence of the condition was not violated because defendant indubitably did not change his residence without written permission. The first sentence of the condition — requiring defendant to reside where his supervising officer directed — likewise was not violated. Defendant resided exactly where his supervising officer directed, at the Budget Inn.

¶ 18. The State points out that the probation officer's approval of the Budget Inn was only temporary. The State therefore argues that the officer's imposition of a deadline on the Budget Inn residence was simply a means of implementing the probation condition, not interpreting it. The State contends that this case is therefore more like *State v. Peck*, 149 Vt. 617, 547 A.2d 1329

---

require defendant to live in a specific place, within or without the State of Vermont, for reasons unrelated to rehabilitation or the prevention of further criminal offenses.

. . . .

Condition 18 goes beyond implementation. In effect, it gives open-ended authority to the probation officer to create any location-of-residence probation condition the officer deems appropriate. It is this type of wholesale delegation that other courts have struck down. . . . [T]his condition is unduly restrictive of the probationer's liberty and autonomy and is not fine-tuned to the specific rehabilitative and preventative goals applicable to this case. The court is capable of creating more precise standards to guide the probation officer in imposing restrictions on defendant's residence. Unlike interpersonal contact, which is intimately connected with associational rights, the changing of one's residence is not an incident of daily life; there is no reason why the court cannot anticipate the relevant issues and construct a proper condition. This is not an instance where the court must authorize a probation officer to use substantial discretionary power to implement the probation condition.

159 Vt. at 300-01, 618 A.2d at 481-82. We reiterated this holding, again with respect to the same condition, in *Freeman*, 2013 VT 25, ¶¶ 16-17.

In this case, defendant did not challenge the probation condition at the time of sentencing. The State argues that under *State v. Austin* he therefore could not challenge it collaterally at the time of the probation revocation proceeding. 165 Vt. 389, 402, 685 A.2d 1076, 1084 (1996). We need not address whether *Moses* and *Freeman* provide a separate basis for reversing the probation revocation in this case because we reverse on the basis set forth above in the text.

(1988). In *Peck*, the defendant was required by a probation condition to "complete mental health counseling to the full satisfaction of his probation officer." *Id.* at 618, 547 A.2d at 1330. At the direction of his probation officer, he enrolled in a sexual offender's counseling group, in which admitting to a sex offense was mandatory. The defendant refused to admit his offense and was eventually terminated from the group, at which time he was found in violation of his conditions of probation. We upheld the violation over the defendant's contention that he lacked notice that his conduct would constitute a probation violation. *Id.* at 620, 547 A.2d at 1331.

¶ 19. We do not agree that this case is like *Peck*. In *Peck*, the probation officer had the authority to oversee the completion of mental health counseling; mental health counseling was not completed. In this case, the State characterizes the condition at issue as "a general probation condition requiring that [defendant] find a residence approved by his probation officer." This is a mischaracterization of the condition. The probation condition at issue here gives the officer the authority only to direct defendant to live somewhere. If the officer has given defendant no direction as to where he should live, or gave and then somehow withdrew his direction, defendant cannot be said to be violating his probation officer's nonexistent direction.[3]

¶ 20. The trial court considered and rejected as "unreasonable" this plain-meaning interpretation of the probation condition in its decision imposing a sentence for the alleged violations. The court concluded that it was "more reasonable to interpret this special condition as not requiring DOC to pick a specific residence for Defendant, but rather for DOC to set out certain guidelines within which a probationer — on his or her own initiative — is to locate housing and subsequently seek approval from DOC."

¶ 21. The trial court's preferred interpretation may be a more accurate representation of what commonly happens to probationers with residence restrictions, but it is not what defendant's probation condition says. "Reside where your Supervising Officer directs" does not support a probation officer imposing require-

---

[3] This principle was nicely illustrated by defendant's probation officer's testimony at the hearing on the merits of the violation. When asked, "Was he ever directed to live anywhere he didn't then move?" she answered, "No."

ments of either housing search call frequency[4] or a final, hard deadline for finding permanent housing, punishable by probation revocation. It does not even say that defendant needs a permanent residence. Like the probation officer's attempt to change a condition from contact-based to location-based in *Rivers*, these are the kinds of modifications to conditions that defendants are entitled to contest. 28 V.S.A. § 253(b).

¶ 22. We also differ with the trial court on the responsibility of the DOC. The condition could have been drafted to require the probation officer to give approval to a residence selected by the probationer. Indeed, the failure to phrase the condition in that way is part of the reason that we have found it invalid when properly challenged. See *supra*, n.2. The plain language of this condition gave the selection power to the probation officer, not the probationer. The probation officer gave very limited help to defendant to find a residence when he was released from jail. Thereafter, he gave no help and acted only to supervise and judge defendant's search for housing. We cannot conclude that the probation officer's method of implementation was consistent with the language of the condition.

¶ 23. Next, we address the trial court's conclusion that defendant's living at the Budget Inn violated the condition stating: "You will not live in an apartment complex that allows children, in neighborhoods with large numbers of children, or in neighborhoods near parks, schools, playgrounds, etc, unless otherwise directed by your Supervising Officer." The court found that the probation officer had allowed defendant to live temporarily at the Budget Inn as a direction made notwithstanding the location requirements. It found that the Budget Inn was in "proximity to children" and therefore violated this condition. The court did not explain this finding further, but the only evidence it heard on the issue was the probation officer's testimony that "[t]he Budget motel is directly in front of the police station with a playground that's available to children's use."

---

[4] The trial court and the parties focus mainly on the August 1 deadline as the more important of the probation officer's newly imposed requirements. Although it does not matter to our analysis, we note in passing that the State's brief inadvertently highlights the absurdity of faulting defendant for not making at least one call *daily* in his housing search by discussing whether defendant averaged "slightly more" or "slightly less" than one call per day.

¶ 24. ■ It is impossible to separate out this condition from the first one discussed above because of the way the probation officer supervised defendant's conduct. The probation officer directed defendant to live at the Budget Inn despite its proximity to a playground and withdrew that direction only because of defendant's alleged noncompliance with the first condition. As we have found above, the officer's implementation of the first condition was not in compliance with its language. Under these circumstances, we reverse the trial court's conclusion that defendant violated this second condition. We do not reach defendant's argument that the condition is also overbroad and unduly restrictive.[5] We also do not reach defendant's argument that defendant could not comply with this condition and that his probation cannot be revoked in that circumstance.

*Reversed.*

¶ 25. **Reiber, C.J.,** concurring. I write separately today, not because I disagree with the outcome in this particular case, but rather to express my concern that the direction taken by our recent decisions in violation-of-probation (VOP) cases hampers trial judges' discretion in constructing appropriate probation conditions and determining when those conditions have been violated. This Court has necessarily focused on the due process rights of the defendant and the specificity of the probation conditions imposed at sentencing. While our decisions are meant to ensure that notice of prohibited conduct is communicated to defendants, the trend of those decisions in insisting on more detailed conditions has created an incentive for prosecutors and the Department of Corrections (DOC) to craft increasingly specific and lengthy lists of conditions in an effort to address every contingency to deflect later challenges by defendants at VOP hearings. Concurrently, defense attorneys are not disposed to argue about conditions at sentencing for fear that they might compromise their position for lesser or no jail time. As a result, our decisions on appeals from VOP proceedings focus on parsing the language of the sentencing conditions imposed. This, in turn, results in decreased discretion in the trial court, both at sentencing and at violation, and presents a separation-of-powers problem. Indeed,

---

[5] We also do not, of course, reach the question of whether defendant's proximity to the playground truly endangered the public as the trial court found it did, despite the fact that the playground was attached to a police station.

over time, our decisions have inadvertently eroded the authority of the trial courts to use their discretion and apply common sense and judgment at sentencing, effectively transferring that discretion to the executive branch.

¶ 26. Our jurisprudence concerning the terms of probation conditions has elevated the need for courts to "fashion [conditions] in a precise manner." *State v. Rivers*, 2005 VT 65, ¶ 19, 178 Vt. 180, 878 A.2d 1070. "In light of what is at stake for the probationer — loss of liberty for a violation — it is vital that the probationer have a clear and certain understanding of the obligations assumed." *State v. Hemingway*, 2014 VT 48, ¶ 16, 196 Vt. 441, 97 A.3d 465. We recognized in *Rivers* that "[p]robation conditions must retain some degree of flexibility, and probation officers may be granted a limited amount of discretion in implementing conditions — especially conditions designed to address situations that the court cannot anticipate." 2005 VT 65, ¶ 15. However, we also highlighted that " 'the conditions must be sufficiently precise so that probation officers do not in fact establish them.' " *Id.* (quoting American Bar Association Standards for Criminal Justice 2d § 18-2.3(c)(ii)). This specificity requirement has constitutional dimensions because "[d]ue process requires that the defendant receive fair notice as to what acts may constitute a violation of his probation, thereby subjecting him to loss of liberty." *State v. Gleason*, 154 Vt. 205, 216, 576 A.2d 1246, 1252 (1990) (quotation omitted). Further, we have couched this principle of specificity in the trial court's statutory authority to impose conditions under 28 V.S.A. § 252, and the consequent impermissibility of delegation of this authority to probation officers. See *Hemingway*, 2014 VT 48, ¶ 15 ("The wording of § 252(c) shows that the Legislature intended that defendant receive in writing the exact wording of the conditions by its requirement that the certificate '*explicitly* set[ ] forth the conditions upon which he or she is being released' "); *State v. Moses*, 159 Vt. 294, 300-01, 618 A.2d 478, 482 (1992) (stating that "[i]t is improper for the court to delegate the power to impose probation conditions to a probation officer," and noting that Legislature "placed the power to impose probation conditions on the court, and not on the corrections department and its employees").

¶ 27. It is important to keep in mind that requiring courts to impose specific probation conditions is also intended to preserve the integrity of the judicial branch, including its authority over

probationary sentences. Although sentencing is not "solely a judicial function derived from constitutional mandates," *State v. Saari*, 152 Vt. 510, 518, 568 A.2d 344, 350 (1989), and judicial discretion may be curbed in certain instances, see *id.* at 519, 568 A.2d at 350, the Legislature has specifically authorized the courts to impose probationary sentences and provided guidance for the imposition of those sentences. See 28 V.S.A. § 252; see also *Rivers*, 2005 VT 65, ¶ 19 (reversing trial court's finding of probation violation because probation officer crossed line between enforcement and modification of probation, and authority to craft conditions was thus impermissibly delegated to probation officer).

¶ 28. Despite the importance of these goals — due process notice requirements, the fulfillment of statutory objectives, and separation of powers — they may not always be furthered by the chosen means — precision and specificity in the articulation of conditions at sentencing. Indeed, if taken too strictly, the means employed may actually undermine these ends. The primary benefit of a more flexible interpretative scheme is that it allows the trial court, on a petition claiming that a respondent violated a probation condition, to apply the condition to novel situations that were unforeseen, even unforeseeable, at the time the condition was imposed. See *Rivers*, 2005 VT 65, ¶ 15. Such indeterminacy is an inherent part of complex human social life, and cannot be avoided by mandating that courts and corrections officers anticipate every possible behavior or the shifting social, political, or economic contexts that may affect those behaviors. For this reason, in overturning the probation violation in *State v. Austin*, we did not mean to "cast doubt upon the trial court's role in evaluating a probationer's" compliance with the condition at issue, but rather "adhere[d] to our belief that a probation agreement is not to be treated as a strait-jacket that defies common sense." 165 Vt. 389, 400, 685 A.2d 1076, 1083 (1996) (quotations omitted).

¶ 29. A rule that calls for an overly literal interpretation of probation conditions, and that leaves little room for discretion by probation officers and the trial court for interpreting and applying those conditions, creates an incentive for prosecutors and probation officers at the outset to fashion wordy, complex, and specific conditions that regulate ever-broader aspects of defendants' lives in ever-more stringent ways. These conditions may be designed not merely to reasonably assure "that the offender will lead a law-abiding life," as required by 28 V.S.A. § 252, but also to limit

later challenges by defendants claiming that they did not violate the precise language of the condition. That this incentive is already in play is evidenced by the expansion of conditions in Vermont in recent years, in terms of their increasing number, complexity, and the use of specialized conditions for particular offenses.

¶ 30. This trend is problematic. First, though the due process notice requirement is often seen as procedural — without consideration of the substance of the offense or violation charged — procedural due process is fundamentally rooted in substantive rights, including a respect for liberty and a suspicion of arbitrary government power. *Daniels v. Williams*, 474 U.S. 327, 331 (1986) ("[B]y barring certain government actions regardless of the fairness of the procedures used to implement them, . . . [the Fifth Amendment Due Process Clause] serves to prevent governmental power from being used for purposes of oppression." (quotation omitted)); *Hurtado v. California*, 110 U.S. 516, 527 (1884) (explaining that Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government" (quotation omitted)). Where applications of procedural due process contribute to the proliferation of substantive restrictions by the other branches of government to evade these procedural protections, its use has strayed from its underlying purpose.

¶ 31. Second, although the majority here, in line with our prior cases, grounds application of the specificity requirement in the trial court's authority to establish conditions, the effect of its decision may, ironically, be just the opposite. DOC employees author many if not most of the probation conditions, usually by suggesting a laundry list of standard conditions that apply to all offenders and then adding a second list of specialized, offense-specific conditions. In the vast majority of cases, these conditions are accepted by defendants and incorporated in a signed plea agreement — a contract between the State and the defendant — before they are reviewed by a judge. Alternatively, they may be imposed by a judge in the first instance as part of a suspended sentence. 28 V.S.A. § 205(a)(1).

¶ 32. At sentencing, the court's role is to ensure that the conditions are applicable to the particular defendant, tailoring the conditions to the defendant's situation. 28 V.S.A. § 252(b)(18) ("The Court shall not impose a condition prohibiting the offender from engaging in any legal behavior unless the condition is reasonably

related to the offender's rehabilitation or necessary to reduce risk to public safety."); see also *State v. Whitchurch*, 155 Vt. 134, 137, 577 A.2d 690, 692 (1990) (quoting American Bar Association Standards for Criminal Justice 2d § 18-2.3(e) for proposition that "conditions imposed by the court should be reasonably related to the purposes of sentencing, including the goal of rehabilitation, and should not be unduly restrictive of the probationer's liberty or autonomy"). But there are practical limitations on the court's ability to do so. The court has limited information, and relies heavily on the recommendations and expertise of the prosecutor and the probation officer. It is unlikely that the probation conditions will be rigorously tested through the adversarial process at the sentencing stage, because defense attorneys often, as a tactical matter, focus on arguing for a suspended sentence for their client instead of jail time. Moreover, in cases where defendants have signed a plea agreement, the court is more likely to abide by the voluntary contract between the State and defendant than to hold an evidentiary hearing.[6] This confluence of factors has resulted in a situation where at sentencing the adversarial process is at its nadir. Thus the courts' duties are greatest at the time when they are most difficult to fulfill.

¶ 33. In this case, while acknowledging defendant's efforts to find housing and the difficulties he faced, the VOP court addressed the problem in a practical, common-sense manner, basing its conclusion on a balancing of factors with concern for public safety. Although ultimately we conclude that the court's finding of a violation was not justified by the plain language of the conditions, the court's thoughtful, discretionary approach is one that we should encourage.

¶ 34. The majority recognizes the practicality of the court's approach, stating that "[t]he trial court's preferred interpretation may be a more accurate representation of what commonly hap-

[6] These difficulties are further compounded by our holding in *Austin* that defendants may only bring facial challenges to conditions at sentencing or on direct appeal, and may not raise such challenges for the first time during a VOP hearing. 165 Vt. at 402, 685 A.2d at 1084. As the majority notes, practically the same condition at issue in this case was struck down by this Court in *Moses*, 159 Vt. at 300-01, 618 A.2d at 482, and again in *State v. Freeman*, 2013 VT 25, ¶¶ 16-17, 193 Vt. 454, 70 A.3d 1008. Yet DOC still proposed, and defendant is bound by, the condition because he did not previously challenge it. Under *Austin*, courts do not have the authority during a VOP hearing to correct errors, even constitutional ones, in the conditions that were imposed at sentencing.

pens to probationers with residence restrictions," but holds that this is "not what defendant's probation condition says." *Ante*, ¶ 21. According to the majority, the requirement to " '[r]eside where your Supervising Officer directs' does not support a probation officer imposing requirements of either housing search call frequency or a final, hard deadline for finding permanent housing, punishable by probation revocation." *Ante*, ¶ 21. While it is true that the condition does not itself impose the requirements used by the probation officer, I am concerned that our holding will lead to more specific conditions as to these requirements — the number and frequency of calls or a hard deadline for housing. Such specificity reduces discretion at sentencing and transfers greater authority to DOC.

¶ 35. Just as specificity can protect defendants if they do not technically violate the condition's plain language, it can be equally unforgiving if they do. Our holding that probation officers cannot cross the line between implementing and modifying conditions, see *Rivers*, 2005 VT 65, ¶ 19, should not be construed to require courts to abandon common sense when interpreting probationary agreements. *Austin*, 165 Vt. at 400, 685 A.2d at 1083 (stating that probation agreement is "not to be treated as a strait-jacket that defies common sense" (quotations omitted)).

¶ 36. The challenge here is to refrain from elevating procedure over substance. The understandable desire to bring uniformity, determinacy, and predictability to probationary sentences must not take precedence over the duty of judges to use their common sense and judgment to do justice in individual cases. The alternative, a rigidly determinate sentencing scheme, has superficial appeal but ultimately creates the risk of ceding the trial judges' authority, even if inadvertently, to the executive branch charged with enforcement.[7] For these reasons, I encourage trial courts to use their discretion in imposing probation conditions or finding

---

[7] There are parallels with the Federal Sentencing Guidelines, which were originally enacted to impose greater uniformity and certainty in sentencing in response to the perception that unlimited judicial discretion was contributing to unfairness in sentencing. See generally S. Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 Hofstra L. Rev. 1, 4-5 (1988) (explaining rationales of "honesty in sentencing" and uniformity in Federal Sentencing Guidelines); see also *United States v Booker*, 543 U.S. 220, 253 (2005) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."). The Guidelines may have produced greater uniformity and certainty in sentencing, but with a commensurate

violations and urge this Court to avoid, if possible, micromanaging the articulation of those conditions.

¶ 37. I am authorized to state that Justice Crawford joins this concurrence.

reduction in judicial discretion at sentencing. Because the Guidelines are complex, rigid, and heavily fact-dependent, they had the unintended consequence of encouraging prosecutors to be more proactive in adjusting the charges to the desired sentence, thereby significantly controlling sentencing determinations before the case would ever be heard before a judge. This led to a shift in sentencing power from the judicial to the executive branch. F. Bowman, III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 Colum. L. Rev. 1315, 1340 (2005).

In *Booker*, the U.S. Supreme Court encouraged greater judicial discretion in sentencing by making the Guidelines advisory — thereby permitting the sentencing judge to tailor the sentence in light of other statutory factors — and by providing a more deferential standard of review in case of departure from the applicable Guideline range. 543 U.S. at 248-49. Commentators have opined that the ultimate effect of making the Guidelines advisory and providing for more discretionary appellate review of sentences was to "br[ing] to a halt the drive to shift the power to punish away from the judiciary and put it in the hands of federal prosecutors." S. Klein & S. Thompson, *DOJ's Attack on Federal Judicial "Leniency," the Supreme Court's Response, and the Future of Criminal Sentencing*, 44 Tulsa L. Rev. 519, 542 (2009). This Court should take heed regarding the imposition and interpretation of probation conditions. The price of certainty at the outset may be limitations on the judge's discretion and consequent ability to do justice in particular cases later on.